UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| GERALYN SENTZ, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. C-07-324 |
| § | |
| MICHAEL J ASTRUE, § | |
| § | |
| Defendant. § | |

## ORDER

On this day came on to be considered Plaintiff's brief in support of her complaint, which has been construed as a motion for summary judgment, (D.E. 7), and Defendant's motion for summary judgment, (D.E. 8, 9).[1] For the reasons discussed below, Plaintiff's motion is hereby GRANTED and Defendant's motion is hereby DENIED.

**I.     Jurisdiction.**

The Court has federal subject matter jurisdiction over this case pursuant to 42 U.S.C. § 405(g).

**II.    Procedural History.**

On March 7, 2003, Plaintiff filed an application for disability insurance benefits. (Administrative Record ("AR") at 50.) In her application, Plaintiff claimed that, on August 2, 1992, she became unable to work due to pain, fatigue, and elevated heart rate, caused by lupus, stiff person syndrome, sleep disorder, and anxiety. (Id. at 50, 56.) On April 24, 2003, Plaintiff's initial application was denied. (Id. at 23, 27.) The denial stated that the evidence was "not

---

[1]     Pursuant to the magistrate's briefing schedule, dispositive motions were due November 19, 2007, and responsive briefs were due December 19, 2007. (D.E. 6.) Plaintiff's motion was timely filed on November 19, 2007. (D.E. 7.) Defendant's motion, however, was not filed until December 19, 2007, one month after the dispositive motion deadline. (D.E. 8, 9.) In the interests of justice, this Court will consider Defendant's motion as a timely-filed response to Plaintiff's motion.

sufficient to show that [her] conditions were disabling prior to December 31, 1997 when [her] period of coverage ended." (Id.) On April 30, 2004, her application was denied on reconsideration. (Id. at 33.) Again, the denial explained that "[t]he evidence we now have is not sufficient to show that your conditions were disabling prior to December 31, 1997 when your period of coverage ended." (Id. at 36.)

On May 28, 2004, Plaintiff requested that an administrative law judge ("ALJ") review her claim. (Id. at 37.) The ALJ conducted a hearing on November 7, 2005. (Id. at 40.) Before the hearing, Plaintiff introduced 434 new pages of medical records, spanning a period of approximately thirteen-years between 1991 and 2004. (Id. at 229-663; see also D.E. 12, at 2-3.) The ALJ did not question Plaintiff during the hearing. (Id. at 665-693.)

On April 10, 2006, the ALJ denied benefits. (AR at 12.) The ALJ made only two explicit findings in his written decision:

1. [Plaintiff] last met the insured status requirements of the Social Security Act on December 31, 1997.

2. [Plaintiff] was not under a "disability," as defined in the Social Security Act, at any time through December 31, 1997, the last date insured.

(Id. at 18.) On May 23, 2006, Plaintiff requested that the Appeals Council review the ALJ's decision. (Id. at 8.) On June 15, 2007, the Appeals Council denied the request for review, making the ALJ's denial the Commissioner's final decision. (Id. at 3.) On August 1, 2007, Plaintiff brought the present action. (D.E. 1.)

### III. Factual Background.

#### A. Pre-December 31, 1997 Medical Evidence.

During the insured period, Plaintiff was diagnosed with several chronic diseases. On June 26, 1992, Dr. James Thompson, Plaintiff's family doctor, diagnosed Plaintiff with systemic

lupus erythematosus ("lupus").[2] (AR at 87.) In a January 24, 1996 letter, Dr. Kirby Barker, Jr. reported that Plaintiff's lab evaluation supported a finding of lupus, and that her anemia was caused by a chronic collagen disorder.[3] (Id. at 494.) On June 4, 1997, while admitting Plaintiff to the Bay Area Hospital for a fever, Dr. Barker described Plaintiff's past medical history as including "systemic lupus erythematosus, hypothyroidism, and Sjogren's syndrome."[4] (Id. at 486.) The following day, in response to a request for information, Dr. Barker informed hospital doctors that "[p]atient has SLE [systemic lupus erythematosus] that was diagnosed 5-6 years ago." (Id. at 489.)

Plaintiff also presented irregular hematology before the last insured date. On February 25, 1991, tests of Plaintiff's blood revealed the presence of anti-nuclear antibodies ("ANA").[5] (Id. at 449.) On January 19, 1994, additional blood tests showed high levels of globulin,[6] potassium, creatine kinase,[7] and TPRO,[8] low levels of hemoglobin[9] and hemacrit,[10] and low red

---

[2]  "Systemic lupus erythamatosus" is "a chronic, remitting, relapsing inflammatory, often febrile multisystemic disorder or connective tissue, acute or insidious in onset, characterized principally by involvement of the skin, joints, kidney, and serosal membranes. It is of unknown etiology, but it is thought to represent a failure of regulatory mechanisms of the autoimmune system, as suggested by the high level of numerous autoantibodies against nuclear and cytoplasmic cellular components. It is marked by a wide variety of abnormalities, including arthritis and arthralagias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, elevated erythrocyte sedimentation rate, and positive LE-cell preparations." Dorland's Illustrated Medical Dictionary 1032 (29th ed. 2000) ("Dorland's").

[3]  A "collagen disease" is "any of a group of diseases that, although ... not necessarily related ... have in common widespread pathologic changes in the connective tissue; they include [lupus], dermatomyositis, scleroderma, polyarteritis nudosa, rheumatic fever, and rheumatoid arthritis." Dorland's, at 513.

[4]  "Sjogren's syndrome" is "a symptom complex ... marked by the triad of keratoconjunctivitis [*i.e.*, inflammation of the cornea] ... xerostomia [*i.e.*, dryness of the mouth from salivary gland dysfunction] ... and the presence of a connective tissue disease, usually rheumatoid arthritis but sometimes [lupus], scleroderma, or polymyositis. An abnormal immune response has been implicated." Dorland's, at 1767.

[5]  "Antinuclear antibodies" are "antibodies directed against nuclear antigens; ANA against a variety of different antigens are almost invariably found in [lupus] and are frequently found in rheumatoid arthritis, scleroderma, Sjogren's syndrome, and mixed connective tissue disease." Dorland's, at 99.

[6]  "Globulin" refers to a class of proteins. Dorland's, at 751.

[7]  "Creatine kinase" is an enzyme that acts as a catalyst in the reaction whereby muscle energy is stored. Dorland's, at 417.

and white blood cell counts. (Id. at 440.) A blood test performed on September 15, 1995, revealed high levels of globulin, creatine kinase, and total protein, low levels of hemoglobin and hemacrit, low red and white blood cell counts, and a low A/G ratio,[11] and a blood test performed on November 7, 1995, revealed the same abnormalities, plus low granulocyte and platelet counts. (Id. at 430-31, 434-45.) Further blood tests, on December 13, 1995, confirmed low levels of hemoglobin and hemacrit, and low red and white blood cell counts.[12] (Id. at 428-29.) And, on January 10, 1996, blood tests revealed the presence of speckled ANA and anti-Sjogren's antibodies, high levels of globulin and BUN,[13] low levels of hemoglobin and hemacrit, a low A/G ratio, a low red blood cell count, and a normal white blood cell count. (Id. at 424-25.)

During the insured period, Plaintiff had abnormal pap smears. On March 27, 1991, Dr. Thompson performed a pap smear that yielded normal results. (Id. at 448.) A subsequent test, on December 18, 1991, however, revealed cells with atypical changes. (Id. at 447.) A third pap smear, taken on March 6, 1992, revealed signs of chronic, mild inflammation. (Id. at 442, 445.)

On January 6, 1993, Dr. Carmen Casas examined Plaintiff on a referral from Dr. Thompson. (Id. at 91.) Plaintiff presented an intensely pruritic[14] papulosquamous[15] eruption in

---

[8]     "TPRO" is an abbreviation for "total protein."

[9]     "Hemoglobin" is "the red oxygen-carrying pigment of erythrocytes [i.e., the oxygen-carrying element of blood]." Dorland's, at 802.

[10]    "Hemacrit" is a measurement of the ratio of hemoglobin to blood volume.

[11]    A low A/G, or albumin-globulin, ratio often indicates impaired liver function. See http://www.brooksidepress.org/Products/Military_OBGYN/Lab/AGRatio.htm.

[12]    Plaintiff's globulin, Sjogren's antibodies, A/G ratio, and ANA levels were not tested.

[13]    High levels of BUN, or blood urea nitrogen, indicate impaired kidney function. See http://www.med.umich.edu/1libr/aha/aha_bunitest_crs.htm.

[14]    "Pruritic" means itchy. Dorland's, at 1480.

[15]    "Papulosquamous" indicates a dermatosis both papular (i.e., characterized by small bumps) and scaly, including pityriasis rosea. Dorland's, at 1314.

the pelvic region. (Id.) She claimed it had recurred every winter for four years. (Id.) Dr. Casas diagnosed plaintiff with "atypical pityriasis rosae vs. a reactive dermatitis," and prescribed a topical steroid cream. (Id.) Dr. Casas also performed skin biopsies of the lesions; the results are not in the record. (Id.)

In September 1995, Plaintiff began to experience unusual fatigue and weakness. (Id. at 102.) On January 24, 1996, Dr. Barker reported the results of a bone marrow aspiration and biopsy. (Id. at 102.) He noted that the results supported Dr. Thompson's diagnoses of anemia of chronic disease, caused by lupus. (Id.) He observed that only treatment for her underlying disorder could alleviate Plaintiff's anemia. (Id.)

On June 4, 1997, Plaintiff was hospitalized briefly with a high fever. (Id. at 486.) Dr. Thompson wrote that "[t]he patient has essentially been on bed rest at home. She, however, is not disabled as of before the illness." (Id. at 486.) Dr. Thomas Fojtasek reported that Plaintiff had been diagnosed with lupus about six years before her visit, which was one possible cause of her fever. (Id. at 489-490.)

**B.      Post-December 31, 2007 Medical Evidence.**

On April 20, 1998, Plaintiff saw Dr. David Petros for the first time. (Id. at 327.) In his new patient evaluation, Dr. Petros wrote:

> This is a very pleasant 41-year-old who has a history of an undefined collagen vascular disease. Whether this is lupus or Sjogren's is not clear. Her biggest problem is fatigue and weakness. Apparently, she was admitted recently. Whether there was some problem, whether it was low red cells or low white counts, was not clear. This was in June of 1997 when she was having a fever and not feeling well with a pain to the right side of her abdomen. Apparently, they did give her antibiotics and she did get better. There was some question if this was typhus, but it was never proven. She has had symptoms for a year. She had seen Dr. Leibfarth in 1990. She has had a flushed burning face and the back would hurt for a while. She was seen by an orthopedic who felt that this was not a bony process or surgical condition. There was some question whether this was Lupus or Sjogren's. Since then, she has seen Dr. Persellin for a couple of months who

> placed her on Plaquenil[16] and she has been on that for a couple of years. It seems to have helped prevent her from developing more system involvement. Her back hurts. It is stiff and it feels like it has a pinching or a tingling feeling. She has had a rash to her face in the past, but not any more. She now has rashes mainly to her trunk that can be diffusely red all over or just localized patches. She has ulcers off and on. She took Zovirax[17] once and that seemed to help. She had alopecia for a while, but now she is on herbs and natural vitamins and those seem to help quite a bit. She denies Raynaud's.[18] Her hands get numb at times. She has to shake them for relief. She has bad headaches from the neck to the temple to the forehead. She gets nauseated at times. Tylenol, or Aleve, but mainly resting in a dark room gives her relief. Her eyes are real dry … Her mouth is real dry and she drinks water constantly … She has some dyspareunia,[19] but no severe dry skin. She does have chronic itching as if her skin is crawling or pinching all over and she will have excoriations that causes red whelps … Her energy is decreased dramatically. She does not sleep well. She cannot turn off her computer. She has depression. She has chronic spells at home. She has low grade fevers and chills. Her headaches come and go … The rash seems to be diffuse to her trunk. It is not that bad right now.

(Id. at 327-328.)

On April 30, 1998, Plaintiff reported that she was suffering from low grade fever and fatigue. (Id. at 291.) Dr. Petros noted that she was positive for anti-nuclear antibodies. (Id.) Ultrasound results showed thickening in her gall bladder walls, but little inflammation otherwise. (Id.) On May 29, 1998, Dr. Petros concluded, through an analysis of test results, that the diagnosis of Sjogren's was correct. (Id. at 290.) At that time, Plaintiff was suffering from diffuse back pain. (Id.) On December 1, 1998, Plaintiff again complained of diffuse pain and exhibited signs of hypothyroidism. (Id. at 299.) Because of localized pain, Dr. Petros injected her right second flexor tendon with Lidocaine and Triamcinolone.[20] (Id.)

---

[16] "Plaquenil" is used to treat lupus and rheumatoid arthritis. See http://www.rxlist.com/cgi/generic/hquine_ids.htm.

[17] "Zovirax" is used to treat herpes viruses. Physician's Desk Reference 820 (61st ed. 2007).

[18] "Raynaud's phenomena" is an intermittent shortage of oxygen to the fingers, toes, ears, and nose, causing pallor and pain. Dorland's, at 1371.

[19] "Dyspareunia" is difficult or painful coitus. Dorland's, at 556.
[20] "Triamcinolone" is an anti-inflammatory. Physician's Desk Reference, at 1726.

On February 22, 1999, Dr. Petros noted that Plaintiff had anti-nuclear and anti-Sjogren's antibodies, as well as a polyclonal gammopathy.[21] (Id. at 325.) Plaintiff was having trouble sleeping and was experiencing heart palpitations. (Id.) Dr. Petros treated her for an upper respiratory infection. (Id.) On May 17, 1999, Plaintiff saw Dr. Petros for tendinitis in her finger. (Id. at 323.) On July 27, 1999, Dr. Petros described Plaintiff as having "an undefined connective tissue disease," but also as "very physically fit." (Id. at 182.) She was also suffering from tennis elbow and a strain of the second flexor tendon. (Id.) Plaintiff reported that Paxil[22] was helping. (Id.) She was also taking Klonopin,[23] Synthroid,[24] and Plaquenil. (Id.) On November 2, 1999, Dr. Petros reported that Plaintiff's tennis elbow was still significant, but that otherwise Plaintiff did not show much arthritis or rash. (Id. at 180.) Her depression continued to improve. (Id.) Lab results showed that Plaintiff was positive for anti-Sjogren's antibodies. (Id.)

On January 25, 2000, Dr. Petros saw Plaintiff again. (Id. at 179.) Labs showed the presence of anti-nuclear antibodies in a nuclear pattern, in addition to the anti-Sjogren's antibodies. (Id.) Her elbow and knee were worse. (Id.)

On August 8, 2000, Plaintiff again saw Dr. Petros. (Id. at 177.) She did not report fatigue; indeed, her energy was good and she was active. (Id.) Although he rendered a diagnosis of Sjogren's syndrome, Dr. Petros thought that she was doing well. (Id.)

On October 31, 2000, Dr. Petros noted that Plaintiff's "major problem is she does not have any time to exercise." (Id. at 175.) He prescribed Paxil because Plaintiff was having anxiety attacks, possibly induced by lack of exercise and the assumption of primary babysitting

---

[21]   "Gammopathy" is a condition marked by disturbed immunoglobulin synthesis. Dorland's, at 725.

[22]   "Paxil" is an anti-depressant. Physician's Desk Reference, at 1530.

[23]   "Klonopin" is used to treat panic attacks and seizures. Physician's Desk Reference, at 2778.
[24]   "Synthroid" is a synthetic thyroid hormone. Physician's Desk Reference, at 521.

duties for her grandchildren. (Id.) Plaintiff said that she would try to take the children to the gym with her, work out for an hour or so, and then bring the children home with her until her daughter picked them up. (Id.) Dr. Petros found her thyroid function to be normal; her labs also indicated elevated globulin, low white blood cell count, and low hemacrit. (Id.) Dr. Petros did not believe that her heart palpitations were caused by an underlying collagen vascular disease; he thought panic attacks or pheochromocytoma[25] more likely. (Id.)

On January 23, 2001, Plaintiff was complaining of significant back pain. (Id. at 173.) She was also depressed, and had been having crying spells. (Id.) She had stopped taking Paxil because of its effect on her libido. (Id.) Radiology tests from that day indicated that plaintiff suffered from mild scoliosis. (Id. at 187-88.)

On August 31, 2001, Dr. Petros noted that Plaintiff probably had Sjogren's, but that her major problem was severe paraspinal muscle spasms. (Id. at 167.) Her neck exhibited significant degeneration. (Id.) She did not have active synovitis[26] or rash. (Id.) She was not able to be very active. (Id.) She was also suffering from what appeared to be panic attacks. (Id.)

On September 10, 2001, Dr. Petros reported being "worried about the elevated creatine kinase." (Id. at 170.) Plaintiff's strength was normal, and Dr. Petros thought it possible that she suffered from a mild myopathy without significant myositis. (Id.) She weighed 107 pounds, and anti-Sjogren's antibodies were present. (Id.)

On October 23, 2001, Plaintiff reported that her condition had gotten much worse. (Id. at 169.) She was suffering more pain; however, she still exercised and her strength was good. (Id.)

---

[25] A "pheochromocytoma" is a "[t]umor that forms in the center of the adrenal gland (gland located above the kidney) that causes it to make too much adrenaline." See http://www.cancer.gov/cancertopics/types/pheochromocytoma/.

[26] "Synovitis" is the inflammation of a synovial membrane, which are the membranes which line most joints. Dorland's, at 1773.

Dr. Petros thought it likely that Plaintiff's undefined connective tissue disorder had caused myopathy or myositis. (Id.) He prescribed Medrol[27] and Prevacid.[28] (Id.) He also noted that Plaintiff had some endocrinology problems. (Id.) She still weighed 107 pounds. (Id.)

On November 6, 2001, Dr. Petros observed that Plaintiff tested positive for anti-nuclear antibodies, polyclonal gammopathy, and anti-Sjogren's antibodies, as well as elevated creatine kinase. (Id.) She was still in pain, but showed no weakness. (Id.) She was still taking Plaquenil, Klonopin, Sythroid, Toprol,[29] Prevacid, and Paxil. (Id.)

On January 15, 2002, Plaintiff was in better spirits, and did not show any signs of active inflammation. (Id. at 165.) On April 12, 2002, she was still in pain. (Id. at 164.) Dr. Petros decreased her dosage of Plaquenil because Plaintiff's weight was down to 106 pounds. (Id.) He noted that Prednisone was not helping. (Id.) It appears from his notes that he believed that he had done all that he could for her. (Id. ("I just cannot take this any further.")). He mentioned her "history of lupus." (Id.)

On May 30, 2002, Dr. Petros noted that Plaintiff had elevated creatine kinase and aldolase. (Id. at 163.) Plaintiff complained of back spasms that prevented her from functioning at a high level. (Id.)

On October 4, 2002, Dr. Petros reported that Plaintiff "used to be able to work out at an accelerated rate. (Id. at 162.) Now she is very limited with a lot of pain." (Id.) At that time, he thought it more likely that Plaintiff suffered from a myopathy[30] than a radiculopathy.[31] (Id.) Plaintiff's weight was 109 pounds. (Id.)

---

[27] "Medrol" is used to treat endocrine and rheumatic disorders, as well as collagen diseases including lupus and polymyositis. See http://www.rxlist.com/cgi/generic/methprd.htm.

[28] "Prevacid" is used to treat ulcers. See http://www.rxlist.com/cgi/generic/lansop.htm.

[29] "Toprol" blocks adrenaline receptors. Physician's Desk Reference, at 668.

[30] "Myopathy" is a generic term for diseases of the muscle. Dorland's, at 1171.

On February 14, 2003, Plaintiff went to the emergency room with severe back pain. (Id. at 386.) She reported that it was knifelike, and the worst she had ever experienced. (Id. at 392.) On February 28, 2003, Plaintiff visited Dr. David Petros for muscle aches. (Id. at 161.) Dr. Petros arranged for her to take Valium intravenously. (Id.) At that time, Plaintiff was taking Temazepam,[32] Plaquenil, Toprol, and Prevacid. (Id.) Dr. Petros was aware that Dr. Pleitz had diagnosed her with stiff person syndrome. (Id.) He noted that Plaintiff was "constantly having muscle spasm and pain and stiffness." (Id.) On December 11, 2003, Dr. Baxter Montgomery reported that Plaintiff "appears to have symptoms that are classic for supraventricular tachycardia." (Id. at 542.) From December 14, 2003, to January 3, 2004, Plaintiff wore a heart monitor that detected tachycardia several times. (Id. at 548.)

On April 16, 2004, Dr. Petros noted that Plaintiff had normal strength and exhibited no joint swelling. (Id. at 300.) On June 29, 2004, an esophagogastroduodenoscopy[33] revealed no abnormalities. (Id. at 362, 399.) On July 30, 2004, Plaintiff underwent a successful ventral hernia repair. (Id. at 375-76.)

### C. The November 7, 2005 Administrative Hearing.

On November 7, 2005, the ALJ held a hearing on Plaintiff's disability status. (Id. at 668.) Kathleen Day of Heard & Smith, LLP represented Plaintiff. (Id.) She informed the ALJ that documents regarding Plaintiff's treatment by Dr. Petros were missing from the record. (Id.) The ALJ allowed her thirty additional days to obtain the records. (Id. at 669.) The remainder of

---

[31]   "Radiculopathy" is a generic term for diseases of the nerve root. Dorland's, at 1511.
[32]   "Temazepam" is a hypnotic agent used to treat insomnia. Physician's Desk Reference, at 1860.

[33]   An "esophagogastroduodenoscopy" is an endoscopic examination of the esophagus, stomach, and duodenum. Dorland's, at 622.

the record, including 434 pages of Plaintiff's medical history, was admitted into evidence without objection. (Id.)

Ms. Day explained that the records showed that, during her insured period, Plaintiff suffered from the same symptoms as she did on the date of the hearing. (Id.) The ALJ agreed with Ms. Day that Plaintiff was currently suffering from an impairment that met or exceeded the diagnostic criteria for polymyocitis, a listed disability in 20 C.F.R. 404 Subpt. P, App. 1, § 14(b)(4). (Id. at 669-70.) Ms. Day then summarized the exhibits establishing that Plaintiff suffered from undiagnosed polymyocitis during her insured period. (Id.) She referred to documents showing that Plaintiff had rheumatological symptoms and a non-significant rash in 1989. (Id. at 669-70; see also id. at 91-93.) She pointed out that Plaintiff had been misdiagnosed with systemic lupus erythematosus on January 11, 1996, by Dr. James Thompson and actively treated for similar symptoms since 1992. (Id. at 671; see also id. at 94.) She also directed the ALJ to Dr. Barker's report, in which he suggested that Plaintiff had lupus, which causes symptoms very similar to polymyocitis. (Id. at 671.) Finally, Ms. Day noted that Plaintiff exhibited signs of anemia and tested positive for Sjogren's disease. (Id. at 672; see also id. at 101-02.)

Ms. Day then moved on to the evidence after Plaintiff's insured date. She pointed to lab results indicating a chronic inflammatory response. (Id. at 672; see also id. at 353.) She noted that Dr. David Petros thought that the lab results confirmed the Sjogren's diagnosis. (Id. at 673; see also id. at 290.) She pointed out that Plaintiff had a history of diffused stiffness in her back, which was consistent with her current diagnosis of stiff person syndrome. (Id.) She then mentioned that Plaintiff suffered from sleeping problems and was prescribed several medications, including Elavil and Klonopin. (Id.) She suggested that Plaintiff also met the criteria for listed impairment 12.06, undifferentiated connective tissue disorder. (Id.; see also 20

C.F.R. 404 Subpt. P, App. 1, § 14(b)(5).)  She drew the ALJ's attention to a series of exhibits which documented Plaintiff's history of panic attacks, suggesting that Plaintiff would experience difficulty maintaining concentration, persistence, and pace.  (AR at 674; see also id. at 302, 458, 661.)

At the hearing, Plaintiff testified that she left school after completing the ninth grade, and had last worked in 1992, as a purchasing buyer at IRC.  (Id. at 675.)  She explained that she had experienced severe pain in her upper back and shoulders, fevers, and shaking towards the end of her time at IRC.  (Id.)  She also described her sleep disorder, which first manifested in 1985 and sometimes kept her awake all night.  (Id. at 675-76.)  She then testified that she was terminated from her position at IRC for excessive absenteeism.  (Id. at 676.)

Plaintiff explained that she sought treatment for her back pain and sleep disorder from several doctors, who could not diagnose her.  (Id. at 677-78.)  She testified regarding the high fever and dehydration that led to her hospitalization in June 1997.  (Id. at 678-79.)  She described the gradual decline in her overall physical condition, and in her cognitive functioning.  (Id. at 680-83.)  Eventually, she was completely debilitated for several days each week, mentally and physically unable to leave her bed except to use the bathroom.  (Id. at 683-84.)  At one point, Plaintiff experienced a nine-pound weight loss in three weeks.  (Id. at 684.)  She explained that before the onset of her illness and anemia, she ran five miles every day.  (Id.)  Finally, she testified that she began to experience anxiety severe enough to impact her heartbeat and breathing when she was about forty years old.[34]  (Id. at 685-86.)

The ALJ then called the vocational expert to testify.  (Id. at 687.)  The ALJ set up a series of hypothetical questions by asking the vocational expert to:

---

[34] Plaintiff was born on April 4, 1957.

> Assume an individual who alleges an onset of disability at age 35. She was 40 at her date last insured. She has a 9th grade education, plus she had a half year of data entry and computer classes, insofar as the educational qualifications are concerned. Her past relevant work history is more specifically delineated in Exhibit 1E [AR 56-57], and as she testified here to this date. For my first hypothetical, I'm going to restrict her to a maximum lift and carry of 20 pounds occasionally, 10 pounds frequently, which is roughly a gallon of milk, which weighs 8.8 pounds. However, for this hypothetical she could sit and stand six of eight, sit, stand, and walk six of eight, sit six of eight with the normal break periods. I'm going to restrict her from any work that would require her to perform at unprotected heights. I'm going to restrict her from climbing up ladders, ropes, or scaffolds.

(Id. at 689.) The vocational expert testified that such an individual would be able to perform Plaintiff's past relevant work. (Id.) He explained that the data entry position was classified as sedentary and skilled pursuant to the DOT, and the buyer position was light and skilled. (Id. at 690.) In response to the ALJ's questioning, the vocational expert testified that an individual who could lift a maximum of ten pounds would also be able to perform Plaintiff's past relevant work. (Id.) However, such an individual would be subject to termination if unable to work several days of each month, even with a doctor's excuse for the missed days. (Id. at 690-91.) Furthermore, such an individual would be subject to termination if symptoms regularly rendered her unable to maintain the attention, concentration, and pace required. (Id. at 691-92.)

### D. The ALJ's Decision.

On April 10, 2006, the ALJ denied Plaintiff's claim in a four-page written decision. (Id. at 15.) The ALJ began his decision by setting forth, in substantial detail, the legal standards for evaluating Plaintiff's claim. (Id. at 15-17.) He then, in a section titled, "Evaluation of the Evidence," recounted some of the evidence provided by Plaintiff, describing in a general way evidence pertinent to Plaintiff's skin problems, back pain, sleep disorder, and chest pain. (Id. at 17-18.) He concluded with a paragraph stating:

> The claimant's allegations are found to be credible only insofar as they are supported by the medical record. Her subjective complaints of disabling impairments since 1992 are not supported by objective medical findings. This conclusion is consistent with the analyzes [*sic*] for the state agency in 8F and 9F.

(Id.) He then made two findings of fact and conclusions of law: (1) [Plaintiff] last met the insured status requirements of the Social Security Act on December 31, 1997, and (2) [Plaintiff] was not under a "disability," as defined in the Social Security Act, at any time through December 31, 2997, the last date insured. (Id.)

## IV. Discussion.

Plaintiff appealed the ALJ's decision to this Court, alleging that the Commissioner erred in "fail[ing] to properly evaluate disability pursuant to 20 CFR § 404.152." (D.E. 7 at 2.) Specifically, Plaintiff argues that the ALJ "failed to conduct a proper five step analysis of the case and failed to state any reason for th[e] adverse determination." (Id. at 3.) Defendant, on the other hand, argues that "[t]he ALJ properly did not complete the sequential evaluation because he determined that [Plaintiff] had not provided sufficient evidence for the relevant time period." (D.E. 9 at 5.)

### A. Standard of Review.

An individual may obtain a review of the final decision of the Commissioner by a United States District Court. 42 U.S.C. § 405(g). The court's review of a denial of disability benefits is limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the proper legal standards. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002) (citing Estate of Morris v. Shalala, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence "is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002); Watson v. Barnhart, 288 F.3d 212,

215 (5th Cir. 2002). The court will not re-weigh the evidence, try the questions de novo, or substitute its judgment for the Commissioner's, even if the court believes that the evidence weighs against the Commissioner's decision. Masterson, 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve." Id. (quoting Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)).

### B. The ALJ Erred In Failing to Apply the Five-Step Analysis.

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." Audler v. Astrue, 501 F.3d 446, 447-448 (5th Cir. 2007). "If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated." Audler, 501 F.3d at 448 (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." Audler, 501 F.3d at 448.

While the ALJ in this case did outline, in his written decision, the five-step analysis discussed above, he did not apply any of the steps to Plaintiff's claim. (AR at 15-18.) Instead, he summarily concluded that "[t]he claimant was not under a 'disability,' as defined in the Social Security Act, at any time through December 31, 1997, the date last insured," without addressing any of the five steps, or identifying at which step he terminated his inquiry. (Id. at 18.) Defendant urges, without reference to any case law, that, where the ALJ determines that a

plaintiff has not provided adequate evidence to support her claim, the ALJ need not conduct the five-step analysis. (D.E. 9 at 5.) Defendant, however, has not provided, and the Court cannot find, any authority indicating that application of the five-step analysis to Plaintiff's claim is anything less than mandatory. See 20 C.F.R. § 404.1520 (explaining the five-step process and listing limited circumstances in which it does not apply – *i.e.*, when a person is already receiving benefits, § 404.1520(a)(5), and when a person meets one of the medical-vocational profiles set forth § 404.1562, § 404.1520(g)(2)) – none of which are present in this case); see also Hernandez v. Astrue, No. 07-30816, 2008 U.S. App. LEXIS 5477, *3 (5th Cir. Mar. 13, 2008) ("As **required** by 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) … the ALJ applied a five-step, sequential evaluation process to determine whether [Plaintiff] was disabled.") (emphasis added); Martinez v. Astrue, 252 Fed. Appx. 585, *2 (5th Cir. 2007) ("In finding that [Plaintiff] was not disabled, the ALJ correctly executed the five-step inquiry **required** by 20 C.F.R. § 404.1520) (emphasis added).

### C. The ALJ Erred In Failing To Explain The Reasons for His Denial.

The Social Security Act directs the Commissioner of Social Security "to make any findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter." 42 U.S.C. § 405(b)(1). The Act makes clear that:

> Any such decision by the Commissioner of Social Security, which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and **the reason or reasons upon which it is based**.

Id. (emphasis added).

The ALJ's sole explanation for his denial of Plaintiff's claim consists of a single paragraph, stating:

> The claimant's allegations are found to be credible only insofar as they are supported by the medical record. Her subjective complaints of disabling impairments since 1992 are not supported by objective medical findings. This conclusion is consistent with the analyzes [*sic*] for the state agency in 8F and 9F.

(AR at 18.) The ALJ discussed neither the "objective medical findings" on which his decision was based, nor the reasons for his credibility determination. The Fifth Circuit has held that this type of "'bare conclusion is beyond meaningful judicial review.'" Audler, 501 F.3d at 448 (quoting Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)); see also Peck v. Barnhart, 214 Fed. Appx. 730, 734-735 (10th Cir. 2006) ("In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion … and whether he applied the correct legal standards to arrive at that conclusion.") (quoting Clifton, 79 F.3d at 1009) (internal quotation marks omitted).

### D. The ALJ Erred In Failing to Properly Assess Plaintiff's Credibility.

Social Security Ruling (SSR) 96-7p, explains the factors to be considered in assessing the credibility of a plaintiff's statements about her symptoms. See Beck v. Barnhart, 205 Fed. Appx. 207, 212 (5th Cir. 2006). This ruling establishes a two-step process "for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness and nervousness":

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) …
>
> Second, … the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record …

SSR 96-7p recognizes that "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." Consequently, it adopts seven factors "that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements":

(1) The individual's daily activities;
(2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
(3) Factors that precipitate and aggravate the symptoms;
(4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
(5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
(6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
(7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Furthermore, SSR 96-7p makes clear that:

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. **It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."** It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. **The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.** This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.

(Emphasis added.)

As discussed above, the ALJ did not provide any reasons for his adverse credibility determination. Rather, he stated merely that Plaintiff's "subjective complaints of disabling impairments since 1992 are not supported by objective medical findings." (AR at 18.) This is precisely the type of "conclusory statement" that is expressly prohibited by SSR 96-7p.

### E. The ALJ Erred In Failing To Consider All of the Evidence.

Finally, "[t]he record must demonstrate that the ALJ considered *all* of the evidence." Clifton, 79 F.3d at 1009-1010 (emphasis added) (citing Vincent ex rel. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984)). While the ALJ need not discuss every piece of evidence in his decision, he must discuss "the evidence supporting his decision, … the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects." Id. (citing Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984)). In this case, it appears that Plaintiff provided the ALJ with a substantial amount of evidence that he did not review. Specifically, between July 26, 2004, and November 7, 2005, Plaintiff submitted 434 pages of medical records that were not reviewed by the state agency, or the state agency physicians on whose reports the ALJ appears to have heavily relied. (AR at 229-663; see also D.E. 12, at 2-3.) These additional records were not addressed by the ALJ in his decision, and the Court has not evidence that they were considered by the ALJ at all. (AR at 214-215, 228.) A meaningful review of Plaintiff's claim requires consideration of all relevant evidence.

### F. The ALJ's Error Was Not Harmless.

Having concluded that the ALJ erred as described above, the Court must now determine whether these errors were harmless. See Audler, 501 F.3d at 448 (citing Morris v. Bowen, 864 F.2d 333, 334 (5th Cir. 1998)). "'Procedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" Audler, 501 F.3d

at 448 (quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).  The Court finds that Plaintiff's substantial rights have been affected in this case and, thus, that the ALJ's errors were not harmless.  There is no indication that the ALJ considered much of the evidence, and the Court's review of such evidence demonstrates that it could support a finding that Plaintiff suffered from a disability during the insured period.

**V.     Conclusion.**

For the foregoing reasons, Plaintiff's motion for summary judgment is hereby GRANTED, and Defendant's motion for summary judgment is hereby DENIED.  The Court REVERSES and REMANDS this case to the ALJ for further proceedings consistent with this opinion.

SIGNED and ORDERED this 17th day of April, 2008.

                                                 Janis Graham Jack
                                                 United States District Judge